UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Rosemarie Lord

    v.                                    Civil No. 18-cv-475-LM

Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

**REPORT AND RECOMMENDATION**

Rosemarie Lord moves to reverse the decision of the Acting Commissioner of the Social Security Administration ("SSA") to deny her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ"), should be affirmed.

**I. Scope of Review**

The scope of judicial review of the Acting Commissioner's decision is as follows:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

1

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear: though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not.  Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted). Rather, "[a court] must uphold the [Acting Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'the drawing of permissible inference from evidentiary facts [is] the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts.'"  Purdy, 887 F.3d at 13 (quoting Rodriguez, 647 F.2d at 222).  Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so

long as it is supported by substantial evidence." <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

Lord was born in 1965.  She has worked as a bartender and as a retail sales clerk, but stopped working in December of 2013.  In February of 2015, Lord applied for DIB, claiming that since December 31, 2013, she has been disabled as a result of tennis elbow on the right side, carpel tunnel syndrome ("CTS"), hypertension, gastroesophageal reflux disease ("GERD"), asthma, and chronic obstructive pulmonary disease ("COPD").

In April of 2015, Lord was given a consultative physical examination by Dr. Ralph Wolf.[1]  Dr. Wolf diagnosed Lord with eight conditions, including lateral epicondylitis in each elbow,[2] possible bilateral CTS, COPD, hypertension, depression, and GERD.  Under the heading "Recommendations," he wrote:

> Any full-time activity not involving repetitive
> lifting and gripping with the arms should be possible
> now and for the long-term future.  Most standing and
> walking activities as well as most sitting and driving
> activities should be possible now and for the long-

---

[1] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the SSA's] request." 20 C.F.R. § 404.1519.  (Unless otherwise indicated, all references to the Code of Federal Regulations are to the current, <u>i.e.</u>, April 1, 2018, edition.)

[2] Epicondylitis is "[i]nflammation of an epicondyle." <u>Stedman's Medical Dictionary</u> 653 (28th ed. 2006).  An epicondyle is "[a] projection from a long bone near the articular extremity above or upon the condyle."  <u>Id.</u>  A condyle is "[a] rounded articular surface at the extremity of a bone."  <u>Id.</u> at 428.

term future.  Because of continuing elbow and wrist
pain, heavy manual labor and lifting and carrying more
than 10 pounds regularly is not recommended.

Administrative Transcript (hereinafter "Tr.") 407.

In May of 2015, Dr. Natacha Sochat, a state-agency
consultant who did not examine Lord, reviewed her medical
records and assessed her physical residual functional capacity
("RFC").[3]  According to Dr. Sochat, Lord could lift and/or carry
and could push and/or pull 20 pounds occasionally and 10 pounds
frequently, could stand and/or walk (with normal breaks) for
about six hours in an eight-hour workday, and could sit (with
normal breaks) for about six hours in an eight-hour workday.
Beyond that, Dr. Sochat identified no postural, manipulative,
visual, communicative, or environmental limitations.

In August of 2015, Lord was given a consultative
psychological examination by Dr. Denise Moquin.  Dr. Moquin
diagnosed Lord with a premorbid major depressive disorder and
"an unspecified personality disorder, with borderline and
dependency traits," Tr. 415.  However, because the ALJ's
evaluation of Dr. Moquin's opinion is not at issue, there is no
need to describe that opinion in detail.

---

[3] "[R]esidual functional capacity 'is the most [a claimant]
can still do despite [his or her] limitations.'"  Purdy, 887
F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation
governing claims for supplemental security income that is worded
identically to 20 C.F.R. § 404.1545(a)(1), which governs claims
for DIB) (brackets in the original).

In March of 2016, Dr. Craig Stenslie, a state-agency
consultant who did not examine Lord, reviewed her medical
records and conducted a psychiatric review technique ("PRT")
assessment.[4]  After acknowledging diagnoses of affective
disorders and personality disorders, Dr. Stenslie found, among
other things, that Lord had moderate restrictions on her
activities of daily living, moderate difficulties in maintaining
social functioning, moderate difficulties in maintaining
concentration, persistence or pace, and had one or two repeated
episodes of decompensation, each of extended duration.  Those
four analytical categories, in turn, reflect the so-called
paragraph B criteria that appeared in the definitions of mental
impairments in the SSA regulations, up until January 17, 2017,
when a new set of definitions, with new paragraph B criteria,
went into effect.

Dr. Stenslie also assessed Lord's mental RFC.  He opined
that Lord had no limitations in the realm of understanding and
memory and no limitations in the realm of social interaction.
With respect to the realm of sustained concentration and
persistence, he opined that Lord was not significantly limited

---

[4] The SSA uses the PRT to evaluate the severity of mental
impairments at two steps in the five-step sequential evaluation
process it uses to evaluate claims for benefits.  See 20 C.F.R.
§ 404.1520a.

in four of eight abilities, but was moderately limited in the
other four: (1) carrying out detailed instructions; (2)
performing activities within a schedule, maintaining regular
attendance, and being punctual within ordinary tolerances; (3)
working in coordination with or in proximity to others without
being distracted by them; and (4) completing a normal workday
and workweek without interruptions from psychologically based
symptoms and performing at a consistent pace without an
unreasonable number and length of rest periods.  With respect to
the realm of adaptation, Dr. Stenslie opined that Lord was not
significantly limited in three of four abilities but was
moderately limited in her ability to respond appropriately to
changes in the work setting.

     The SSA denied Lord's application for DIB.  She appealed
that decision and received a hearing before an ALJ.  At the
hearing, the ALJ took testimony from a vocational expert ("VE")
to whom he posed a series of hypothetical questions.  The first
question posited "a hypothetical individual of the claimant's
same age and education and . . . past jobs," Tr. 55, with a
limitation to light work, to performing simple routine tasks,
and to dealing with only routine changes in the work setting.
The VE testified that such a person could not perform Lord's
previous work but could perform the jobs of cafeteria attendant,
price marker, and production sorter.  The VE further testified

that no work would be available to a person with the foregoing
limitations plus any one of the following: (1) a limitation to
occasional "reaching overhead [with] both arms [and] reaching
all the planes [with] both arms," Tr. 56; (2) "be[ing] off task
up to 15 percent of the day due to issues of chronic pain and
mental health symptoms," Tr. 57; or (3) having "an inability to
maintain a schedule or consistent attendance," Tr. 58.

After the hearing, the ALJ issued a decision in which he
determined that Lord had four severe impairments, bilateral
lateral epicondylitis, CTS, depression, and personality
disorder, but also determined that none of those impairments,
either alone or in combination, met or equaled the severity of
any of the impairments included in the SSA's list of impairments
that are per se disabling.  Then he assessed Lord's RFC and
found that she had

> the residual functional capacity to perform light work
> as defined in 20 CFR 404.1567(b) except [she] has the
> residual functional capacity to perform less than
> [the] full range of light work except lifting 20
> pounds occasionally and 10 pounds frequently; carrying
> 20 pounds occasionally and 10 pounds frequently;
> sitting for six hours; standing for six hours, walking
> for six hours; push/pull as much as can lift/carry.
> Limited to performing simple, routine tasks and when
> dealing with changes in work setting the individual
> can only deal with routine changes only.

Tr. 16.  Based upon the foregoing RFC and the VE's testimony,
the ALJ determined that Lord was not able to perform her past
work but was capable of performing the unskilled jobs of

cafeteria attendant, price marker, and sorter.  Accordingly, the ALJ determined that Lord was not under a disability from December 31, 2013, through the date of his decision, April 26, 2017.

## III. Discussion

A. <u>The Legal Framework</u>

To be eligible for disability insurance benefits, a person must: (1) be insured for that benefit; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. § 423(a)(1)(A)-(D).  The only question in this case is whether the ALJ correctly determined that Lord was not under a disability from December 31, 2013, through April 26, 2017.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step sequential evaluation process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and

age, is unable to do any other work, the application
is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5
(1st Cir. 2001); citing 20 C.F.R. § 416.920, which outlines the
same five-step process as the one prescribed in 20 C.F.R. §
404.1520).

At the first four steps in the sequential evaluation
process, the claimant bears both the burden of production and
the burden of proof.  See Purdy, 887 F.3d at 9 (citing Freeman
v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen
v. Yuckert, 482 U.S. 137, 146 (1987).  She must prove she is
disabled by a preponderance of the evidence.  See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[5]  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

---

[5] At step five, the burden of proof shifts to the Acting
Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y
of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting
Commissioner's step-five determination is not at issue here, so
there is no need to describe the mechanics of step five.

B.  Lord's Claims

Lord claims that the ALJ erred by: (1) failing to find that her COPD and asthma were severe impairments at step two; (2) making a step-three determination that was not supported by substantial evidence; (3) making an RFC assessment that was not supported by substantial evidence; and (4) relying on VE testimony that was elicited in response to a hypothetical question that incorporated a flawed RFC.  Those four claims all lack merit.  The court considers each in turn.

1.  Step Two

Lord first claims that the ALJ erred at step two by failing to find that her COPD and asthma were severe impairments.  The Acting Commissioner, however, argues that: (1) substantial evidence supports the ALJ's step-two determination; and (2) even if the ALJ erred by finding that Lord's COPD and asthma were not severe impairments, any such error was harmless.  Such an error was harmless, the Acting Commissioner argues, because the ALJ: (1) found that Lord had other severe impairments; (2) continued on with the sequential analysis; and (3) considered the effects of Lord's COPD and asthma impairments when determining her RFC.

At step two, "[i]f [a claimant] do[es] not have any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities, [the SSA] will find that [the claimant] do[es] not

10

have a severe impairment and [is], therefore, not disabled."  20
C.F.R. § 404.1520(c).  That said, "the Step 2 severity
requirement . . . is a de minimis policy, designed to do no more
than screen out groundless claims."  Garneau v. Berryhill, No.
16-cv-448-SM, 2017 WL 4512160, at *7 (D.N.H. Oct. 10, 2017)
(quoting McDonald v. Sec'y of HHS, 795 F.2d 1118, 1124 (1st Cir.
1986); citing Social Security Ruling 85-28, 1985 WL 56856
(S.S.A. 1985)).  However, "[e]rrors at Step Two are harmless as
long as the ALJ [finds] at least one severe impairment,
continue[s] on with the sequential analysis, and consider[s] the
effects of all impairments [both severe and non-severe] on the
claimant's functional capacity."  Id. (quoting Therrien v.
Berryhill, No. 16-cv-185-LM, 2017 WL 1423181, at *4 (D.N.H. Apr.
21, 2017); citing Fortin v. Colvin, No. 3:16-cv-30019-KAR, 2017
WL 1217117, at *10 (D. Mass. Mar. 31, 2017)).

     In his step-two analysis, the ALJ noted both the lack of
medical evidence identifying functional limitations resulting
from Lord's COPD and asthma and the lack of medical-opinion
evidence attributing functional limitations to either of those
two impairments.  That is substantial evidence supporting a
finding that neither of those two impairments significantly
limited Lord's ability to do basic work activities.  See Purdy,
887 F.3d at 13 (defining substantial evidence as evidence that a
reasonable mind could accept as adequate to support a

conclusion); Burgos v. Colvin, No. CA 13-486 ML, 2014 WL
3905707, at *12 (D.R.I. Aug. 11, 2014) ("[a]n ALJ may properly
base his Step 2 finding on the absence of medical evidence")
(citing 20 C.F.R. § 404.1520(a)(4)(ii), (c).

For her part, Lord points to medical evidence in the form
of diagnoses and physical findings but identifies no medical or
medical-opinion evidence concerning the impact of her
impairments on her ability to perform work-related activities.
Rather, the primary evidence of the effects of Lord's COPD and
asthma is her own testimony, "but a claimant's testimony about
symptoms is insufficient to establish a severe impairment at
Step 2 in the absence of medical evidence," Teves v. Astrue,
Civil No. 08-246-B-W, 2009 WL 961231, at *4 (D. Me. Apr. 7,
2009) (citing Duckworth-Bubar v. Barnhart, 242 F. Supp. 2d 30,
32 (D. Me. 2002)), R. & R. aff'd by 2009 WL 1211015 (Apr. 30,
2009).  But, even if the court were not to credit the rule
stated in Teves, it was for the ALJ to resolve the conflict
between: (1) the lack of medical evidence of functional losses
resulting from Lord's COPD and asthma; and (2) her testimony
that she did experience such functional losses.  See Purdy, 887
F.3d at 13.

Moreover, even if the ALJ did err by failing to find that
Lord's COPD and asthma were severe impairments, any such error
was harmless.  The ALJ found that Lord had two severe physical

impairments and noted his obligation to consider both her severe
and non-severe impairments when assessing her RFC.  See Tr. 12.
While the ALJ did not mention COPD or asthma in the section of
his decision devoted to assessing Lord's RFC, he "said enough in
his step—two analysis about the claimant's [COPD and asthma] to
satisfy the SSA's obligation to consider those impairments when
assessing [Lord's] RFC," Riel v. Berryhill, No. 18-cv-278-LM,
2019 WL 636883, at *7 (D.N.H. Jan. 25, 2009) (citing McDonough
v. U.S. SSA, Acting Comm'r, No. 13-cv-164-PB, 2014 WL 2815782,
at *11 (D.N.H. June 23, 2014)), R. & R. approved by 2019 WL
635408 (Feb. 13, 2019); see also Barup v. U.S. Soc. Sec. Admin.,
No. 16-cv-62-PB, 2017 WL 1194644, at *10 (D.N.H. Mar. 31, 2017)
(pointing out that an "ALJ . . . has 'considerable latitude' in
how he or she considers non-severe impairments) (citing Chabot
v. U.S. Soc. Sec. Admin., No. 13-cv-126-PB, 2014 WL 2106498, at
*10 (D.N.H. May 20, 2014)).

     In sum, there is nothing about the way in which the ALJ
conducted his step-two analysis that warrants a remand.

        2.   Step Three

     Next, Lord claims that at step three, the ALJ erred by
making a finding that was not supported by substantial evidence.
At step three, the ALJ determined that none of Lord's four
severe impairment met or equaled the severity of an impairment
on the SSA's list of impairments that are per se disabling.
Lord, however, does not argue that the ALJ erred by finding that
any particular severe impairment did not meet or equal the
severity of a listed impairment.  That is, she does not claim to
have a listing-level mental impairment.  Rather, she challenges
a finding that the ALJ made with respect to one of the several
criteria that SSA decisionmakers must consider when determining
whether an impairment is severe enough to be per se disabling.

     According to the SSA regulations in force up through
January 16, 2017, depression fell under Listing 12.04, titled
affective disorders, and personality disorders were evaluated
under Listing 12.08.  For an affective disorder to be severe
enough to be per se disabling, it needed to satisfy the
requirements of both paragraphs A and B of Listing 12.04, or the
requirements of paragraph C of Listing 12.04.  For a personality
disorder to be severe enough to be per se disabling, it needed
to satisfy the requirements of both paragraphs A and B of
Listing 12.08.

The paragraph B criteria for both listings were identical, and required a claimant to demonstrate at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04B & 12.08B (Apr. 1, 2016).

When Dr. Stenslie performed his PRT assessment in 2016, he used the paragraph B criteria described above.  However, on January 17, 2017, the SSA began using a new set of medical criteria for evaluating mental disorders and explained that those new criteria would apply to all claims pending on, and all claims filed after, January 17, 2017.  Under the new criteria, depression falls under Listing 12.04, titled depressive, bipolar and related disorders, and personality disorders fall under Listing 12.08, titled personality and impulse-control disorders.  To be per se disabling under Listing 12.04, an impairment must satisfy either paragraphs A and B, or paragraphs A and C of that listing.  To be per se disabling under Listing 12.08, an impairment must satisfy both paragraphs A and B of that listing.

As with the previous regulations, the paragraph B criteria are the same for Listings 12.04 and 12.08.

Paragraph B in the new regulations requires a claimant to demonstrate either extreme limitation of one of the following areas of mental functioning or marked limitation of two of them:

> 1. Understand, remember, or apply information (see 12.00E1).
>
> 2. Interact with others (see 12.00E2).
>
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
>
> 4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04B & 12.08B.

The ALJ issued his decision in this case in April of 2017. As a consequence, he used the new paragraph B criteria rather that the old paragraph B criteria, which Dr. Stenslie had used when performing his PRT assessment.  Thus, when the ALJ applied the new paragraph B criteria, he did so without the guidance of any medical expert who had done so before him.  Nevertheless, the ALJ performed a paragraph B analysis, and determined that Lord had moderate limitations in each of the four areas of mental functioning listed in paragraph B.  In explaining his determination, the ALJ referred to the following evidence: Lord's Function Report, her demeanor at her hearing, her treatment notes, test results from Dr. Moquin's consultative examination, and Lord's self-reports to Dr. Moquin.  However,

the ALJ did not refer to the step-three analysis in Dr.

Stenslie's PRT assessment.

According to Lord, remand is required because the ALJ's

paragraph B findings are not supported by substantial evidence.

She bases that claim on the fact that the ALJ based his step-

three determination on the new paragraph B criteria but,

necessarily, did not rely upon any expert opinion that assessed

the severity of claimant's mental impairments under those

criteria.  In claimant's words:

> The ALJ's "paragraph B" criteria findings are not
> supported by substantial evidence.  Rather than being
> based on medical opinion, they are impermissibly based
> on his lay assessment of raw medical evidence.  Nguyen
> v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); Manso-
> Pizarro v. Secretary of Health & Human Services, 76
> F.3d 15, 16 (1st Cir. 1996).
>
> . . . .
>
> [L]ong standing precedent in this circuit holds that
> RFC assessments, which are derivative of "paragraph B"
> assessments in cases, such as this, involving mental
> impairments, must be based on medical expert opinion.
> Nguyen v. Chater, 172 F.3d 31, 34 (1st Cir. 1999);
> Manso-Pizarro v. Secretary of Health & Human Services,
> 76 F.3d 15, 16 (1st Cir. 1996); Gordils v. Secretary
> of Health and Human Services, 921 F.2d 327, 329 (1st
> Cir. 1990).  Because there is no medical opinion
> addressing the new [paragraph] B criteria, the ALJ's
> assessment of the [paragraph] B criteria is not
> supported by substantial evidence.  Thus, remand is
> required.

Cl.'s Mot. to Reverse (doc. no. 8) 7, 8 (footnote omitted).

However, while Lord claims that the ALJ's paragraph B findings

are not supported by substantial evidence, she does not carry

her step-three burden of demonstrating that her depression met
or equaled the severity of Listing 12.04 or that her personality
disorder met or equaled the severity of Listing 12.08.  Be that
as it may, the court turns to Lord's claim that one component of
the ALJ's step-three determination, i.e., his paragraph B
finding, is not supported by substantial evidence.

     An impairment is per se disabling if it meets or medically
equals the severity of a listed impairment.  To determine
whether an impairment meets a listing, a decisionmaker considers
a claimant's "objective medical . . . findings," 20 C.F.R. §
404.1525(c)(3), and compares them to the criteria of the
relevant listing.  To determine whether an impairment medically
equals a listing, the following rules apply:

> When [the SSA] determine[s] if [a claimant's]
> impairment medically equals a listing, [the SSA]
> consider[s] all evidence in [the claimant's] case
> record about [her] impairment(s) and its effects on
> [the claimant] that [are] relevant to this finding.  .
> . .  [The SSA] also consider[s] the opinion given by
> one or more medical or psychological consultants
> designated by the Commissioner.

20 C.F.R. § 404.1526(c).

     The claimant does not articulate whether she believes she
has a mental impairment that meets or equals the severity of a
listed impairment.  Thus, it is not clear whether she is
claiming that the ALJ's decision violated 20 C.F.R. § 404.1525
or 20 C.F.R. § 404.1526.  However, because § 404.1525 requires

SSA decisionmakers to consider objective medical evidence, it was not an error for the ALJ to consider medical evidence, rather than a medical opinion, when determining whether claimant's impairment met a listing.  That leaves § 404.1526, which pertains to medical equivalence.

Section 404.1526 directs decisionmakers to consider a wide range of evidence, including medical opinions, when considering medical equivalence.  And here, the ALJ did consider a variety of evidence when assessing the paragraph B criteria.  He did not, however, mention the opinions that Dr. Stenslie expressed in his 2016 PRT assessment.  The court is aware of no requirement that ALJs make step-three determinations with the assistance of medical opinions.

While claimant argues that step-three determinations require medical opinions, she cites no authority for that proposition.  To the contrary, the cases on which she relies all stand for the proposition that "[a]s a lay person . . . [an] ALJ [is] simply not qualified to interpret raw medical data in functional terms," Nguyen, 172 F.3d at 35 (citations omitted); see also Manso-Pizarro, 76 F.3d at 17 (explaining that "[w]ith a few exceptions . . . an ALJ, as a lay person, is not qualified to interpret raw data in a medical record" to formulate an RFC) (citations omitted); Gordils, 921 F.2d at 329 ("since bare medical findings are unintelligible to a lay person in terms of

residual functional capacity, the ALJ is not qualified to assess
residual functional capacity based on a bare medical record")
(citations omitted).  But, making a step-three determination
does not require an ALJ to interpret raw medical data in
functional terms; the interpretation of medical evidence in
functional terms is part of the RFC assessment, not a step-three
determination.  So, the fact that the ALJ did not rely on any
medical opinions at step three was not a reversible error.[6]

As the court has pointed out, 20 C.F.R. § 404.1526(c) does
direct ALJs to consider opinions from medical consultants, along
with the rest of the evidence in a claimant's case record, when
making a step-three equivalence determination.  But that
regulation does not say that a step-three determination is
invalid if it not supported by such an opinion.  And here, Lord
herself has noted that Dr. Stenslie's opinion was based upon the
old paragraph B criteria, while the ALJ was obligated to use the
new paragraph B criteria.  Under Lord's theory, any ALJ decision
rendered after January 17, 2017, in a case involving mental
impairments, would be subject to remand if the case record did
not include a consultant's opinion based upon the new paragraph

---

[6] As to this issue, Lord is correct in her observation that
an ALJ's RFC assessment should be in line with his step-three
findings, but that does not mean that the requirement for an RFC
assessment to be supported by expert medical opinion also
applies to a predicate step-three determination.

B criteria.  Lord, however, has not identified a single case
that was remanded on this basis, and the court's own search has
identified no such case.  Moreover, when the SSA implemented its
new rules, it stated that when they became effective, the SSA
would "apply them to new applications filed on or after the
effective date of the rules [i.e., January 17, 2017], and to
claims [such as Lord's] that [were] pending on or after the
effective date."  Revised Medical Criteria for Evaluating Mental
Disorders, 81 Fed. Reg. 66138-01, at 66138, 2016 WL 5341732
(S.S.A. Sept. 26, 2016).  Yet, the SSA's implementing
regulations make no suggestion that ALJs rendering decisions
after January 17, 2017, would be unable to make step-three
determinations without medical opinions based on the new
paragraph B criteria.  Rather, as the Acting Commissioner points
out, the SSA actually discussed the correlation between the old
paragraph B criteria and the new paragraph B criteria in its
September 2016 "Revised Medical Criteria" publication, which
provided guidance for ALJs faced with the situation faced by the
ALJ in this case.

     In sum, the court does not agree that the lack of a
consultant's opinion that uses the new paragraph B criteria
warrants a remand.

3.   RFC

Lord's third claim is that three specific aspects of the
ALJ's RFC assessment are not supported by substantial evidence.

a.   Limitations in Pace

According to Lord, in formulating her RFC, "[t]he ALJ did
not adequately account for [her] limitations in pace."   Cl.'s
Mot. to Reverse (doc. no. 8) 9.   Specifically, she claims that
the ALJ was obligated to include a limitation on her ability to
maintain an adequate work pace in her RFC because of Dr.
Stenslie's uncontroverted opinion that she was limited in that
realm.   The court does not agree.

In his step-three PRT assessment, Dr. Stenslie found that
Lord had moderate difficulties in maintaining concentration,
persistence, or pace, and the ALJ echoed that view in his
decision.   In his RFC assessment, Dr. Stenslie found that Lord
had moderate limitations in her abilities to perform activities
within a schedule and to perform at a consistent pace without an
unreasonable number and length of rest periods.   With regard to
pace, he elaborated:

> She is able to complete a normal work day and week
> only with a higher than usual but not higher than
> reasonable number of interruptions to pace from
> psychologically based signs and symptoms.   She is able
> to work within a schedule at a slower than usual but
> not slower than reasonable pace.

Tr. 87 (emphasis added).

22

The ALJ formulated an RFC that limited Lord to "perform[ing] simple, routine tasks," Tr. 16, and to dealing with only "routine changes" in the work setting.

In Lord's view, the ALJ committed two errors: (1) failing to "include any limitation on pace in his mental RFC assessment despite finding moderate limitations in concentration, persistence or pace," Cl.'s Mot. to Reverse (doc. no. 8) 11 (citing McHugh v. Astrue, Civ. No. 09-104-BW, 2009 WL 5218059, at *4 (D. Me. Dec. 30, 2009), R. & R. adopted by 2010 WL 324433 (Jan. 20, 2010); Tilton v. Colvin, No. 2:13-cv-96-GZS, 2014 WL 294477, at *5 (D. Me. Jan. 27, 2014)); and (2) failing "to explain why he did not adopt Dr. Stenslie's specific limitations to slower than usual pace," Cl.'s Mot. to Reverse (doc. no. 8) 11 (citing Shaw v. Colvin, No. 13-cv-503-JL, 2015 WL 1097419, at *2 (D.N.H. Mar. 11, 2015)).  According to Lord, those two errors led the ALJ to formulate an RFC that was not supported by substantial evidence.  The court does not agree.

To begin, the court agrees with Lord's observation that the ALJ's decision does not appear to consider Dr. Stenslie's 2016 opinion; rather, the ALJ focused on his disagreement with a portion of Dr. Stenslie's 2015 opinion.  But even if the ALJ had stated that he fully accepted Dr. Stenslie's 2016 opinion, it is far from clear that: (1) he was obligated to include any

limitations in Lord's RFC based upon that opinion; or (2) that he failed to do so.

As noted, when assessing Lord's mental RFC, Dr. Stenslie opined that she had no more than moderate limitations in any mental ability.  However, "[t]he First Circuit has recognized that moderate mental limitations impose no significant restriction on the range of work a claimant can perform." Brindley v. Colvin, No. 14-cv-548-PB, 2016 WL 355477, at *4 (D.N.H. Jan. 29, 2016) (quoting Hines v. Astrue, No. 11-cv-262-PB, 2012 WL 2752192, at *12 (D.N.H. July 9, 2012) (citing Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2011)); see also McLain v. Astrue, No. SACV 10-1108 JC, 2011 WL 2174895, at *6 (C.D. Cal. June 3, 2011) ("Moderate mental functional limitations . . . do [not] preclude the performance of jobs that involve simple, repetitive tasks") (citation omitted).  And, indeed, "medical opinions indicating that a claimant is at most moderately limited in the relevant areas can 'adequately substantiate' an ALJ's finding that the claimant can function in a work environment." Hines, 2012 WL 2752192, at *10 (citing Falcon-Cartagena, 21 F. App'x at 14; Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 145 (1st Cir. 2004)).  In short, the ALJ did not need to include limitations in Lord's RFC based upon her moderate difficulties in maintaining pace.

Moreover, it would appear that the ALJ did include such limitations in Lord's RFC.  In Mudgett v. Astrue, the claimant

> argue[d] that because the ALJ found that she had moderate limitations in her ability to maintain concentration, persistence, or pace, the ALJ was required to find a corresponding functional limitation [and] that the limitation to simple or unskilled work did not satisfy that requirement.

No. 14-cv-143-JD, 2014 WL 6977863, at *2 (Dec. 9, 2014).  Judge DiClerico disagreed, explaining that

> "[a] finding of moderate limitations in maintaining concentration, persistence, or pace, does not necessarily preclude the performance of unskilled work."  Perry v. Astrue, [Civ. Action No. 11-40-215-TSH,] 2014 WL 4965910, at *6 (D. Mass. Sept. 30, 2014).  When an acceptable medical source provides an opinion that despite moderate limitations in concentration, persistence, or pace the claimant is able to do unskilled work or simple routine work, no further restriction in residual functional capacity is necessary.  Montore v. Astrue, [No. 11-CV-190-SM,] 2012 WL 3583346, at *7 (D.N.H. Aug. 20, 2012); see also Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001) (concluding that a moderate limitation in nonexertional functioning required for unskilled work does "not affect, more than marginally, the relevant occupational base").

Mudgett, 2014 WL 6977863, at *3.  In other words, a limitation to performing simple, routine tasks, which the ALJ included in his RFC assessment in this case, is sufficient to account for the moderate limitations in concentration, persistence, and pace that Dr. Stenslie expressed in his opinion.

Lord relies upon two cases from the District of Maine for the proposition that the ALJ was obligated to account for the

moderate limitations in concentration, persistence, or pace that
he found at step three by doing more than limiting her RFC to
performing simple routine tasks and dealing with routine changes
in the work setting.  In McHugh, the court noted its previous
holdings that "restrictions to unskilled work and to only
occasional judgment, decision-making, and changes in the work
setting . . . do not reflect moderate restrictions in the broad
category of concentration, persistence, or pace," 2009 WL
5218059, at *4 (citing Leighton v. Astrue, No. 07-142-B-W, 2008
WL 2593789, at *1, *4 (D. Me. June 30, 2008); Edwards v.
Barnhart, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005)).  But in
Tilton, the court noted that it had "since clarified that
reversal and remand is not necessarily warranted in a Leighton-
type situation," 2014 WL 294477, at *6, and pointed out that it
had recently "rejected the argument that a limitation to
'unskilled, routine, repetitive tasks with consistency of tasks
on a daily basis' was, on its face, 'fatally inconsistent with
the finding that the [claimant] suffers from a moderate
limitation in his ability to maintain concentration,
persistence, and pace,'" Tilton, 2014 WL 294477, at *6 (quoting
Henderson v. Astrue, No. 2:10-cv-122-GZS, 2011 WL 1130880, at *2
(D. Me. Mar. 25, 2011)).

In light of Tilton, and the fact that this case, unlike
McHugh has an expert opinion that addresses concentration,

26

persistence, and pace in terms of both step three and RFC,
McHugh is of limited persuasive value. Moreover, like the ALJ
in Tilton, who offered a sufficient "discussion of her reasoning
for her translation of a moderate limitation in concentration,
persistence, or pace into [her] RFC finding," 2014 WL 294477, at
*7 the ALJ in this case gave a satisfactory explanation for his
"finding that [Lord's] mental impairments have not resulted in
work-related limitations that would preclude an ability to
engage in substantial gainful activity," Tr. 18; see also Tr.
19.

     In sum, even if the court were to rely upon the authority
form the District of Maine that claimant cites instead of the
authority from this District, which is persuasive, the court
would still find that substantial evidence supports the ALJ's
RFC assessment as it pertains to claimant's mental impairments.[7]

            b.  Upper Extremity Impairments

     Next, Lord claims that when the ALJ formulated her RFC, he
"did not adequately account for limitations related to [her]

---

     [7] Claimant also argues that the ALJ erred by failing to
include in his RFC assessment a limitation reflecting Dr.
Stenslie's opinion that she would experience "a higher than
usual but not higher than reasonable number of interruptions to
pace," Tr. 87, and that she was "able to work within a schedule
at a slower than usual but not slower than reasonable pace," id.
(emphasis added).  However, it seems obvious that an ability to
work at a reasonable pace, with a reasonable number of
interruptions of pace, is not a significant limitation.

upper extremity impairments." Cl.'s Mot. to Reverse (doc. no. 8) 11. According to Lord, once the ALJ found her epicondylitis and CTS to be severe impairments, he was obligated to include limitations resulting from those impairments in her RFC. She is mistaken.

As Judge Barbadoro explained in Johnson v. Berryhill, "[a]lthough an ALJ's . . . determination of the claimant's RFC must take into account [her] mental and physical limitations, it does not need to 'translate severe impairments into the RFC,'" No. 16-cv-375-PB, 2017 WL 4564727, at *4 (D.N.H. Oct. 12, 2017) (quoting Duncan v. Colvin, No. CIV-15-1200-D, 2017 WL 1274392, at *3 (W.D. Okla. Feb. 17, 2017)). In other words:

> An ALJ's finding that an impairment is severe does not necessarily translate into functional restrictions in the RFC. See Griffeth v. Comm'r of Soc. Sec., 217 Fed. App'x 425, 428 (6th Cir. 2007) ("The ALJ's finding that the limitation was [severe], however, was not inherently inconsistent with his finding that the limitation has 'little effect' on the claimant's ability to perform basic work-related activities."); Sykes v. Apfel, 228 F.3d 259, 268 n.12 (3d Cir. 2000) ("A finding under step two of the regulations that a claimant has a 'severe' nonexertional limitation is not the same as a finding that the nonexertional limitation affects residual functional capacity"). Accordingly, although the ALJ determined that Hines's panic disorder was a severe impairment, he was not required to find that the impairment affected Hines's RFC.

Hines, 2012 WL 2752192, at *9. So too here; the ALJ did not err by failing to attribute functional limitations to claimant's epicondylitis or her CTE.

Moreover, the ALJ's determination that Lord had no upper extremity limitations is supported by substantial evidence.  In her opinion on claimant's physical RFC, Dr. Sochat indicated that Lord had no postural or manipulative limitations.  The ALJ gave Dr. Sochat's opinion great weight.  In the report on his consultative examination, Dr. Wolf opined that Lord had some limitations on lifting and gripping.  The ALJ gave Dr. Wolf's opinion limited weight and did so on grounds that are entirely consistent with the regulations that were then in effect, i.e., 20 C.F.R. § 404.1527(c).  Claimant does not challenge the weight the ALJ assigned to the opinions of Drs. Sochat and Wolf, but merely asserts that the ALJ's step-two findings required him to include limitations in her RFC, an argument the court has already rejected.

In sum, the lack of any limitations resulting from claimant's epicondylitis and CTS provides no basis for a remand.

c.   Limitations Related to COPD and Asthma

Finally, Lord claims that when the ALJ formulated her RFC, he "did not adequately account for limitations related to [her] COPD and asthma," Cl.'s Mot. to Reverse (doc. no. 8) 13.  As the court has already explained, the ALJ's discussion of COPD at step two, and the lack of medical evidence for any functional limitations resulting from those impairments, was sufficient to

satisfy the ALJ's obligation, under 20 C.F.R. § 404.1545(a)(2), to consider those impairments when determining Lord's RFC.

      4.  VE Testimony

Lord's final claim is that the ALJ erred in relying upon the testimony of the VE because he gave that testimony in response to an RFC assessment that was flawed. "When an ALJ's Step 4 [or Step 5] determination rests upon an erroneous RFC presented to a VE in a hypothetical question, that determination is not supported by substantial evidence, which requires a remand." Chambers v. Colvin, No. 16-cv-087-LM, 2016 WL 6238514, at *9 (D.N.H. Oct. 25, 2016) (citing Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1982); Marshall v. Colvin, No. 14-cv-239-PB, 2015 WL 248615, at *4 (D.N.H. Jan. 20, 2015)). But since the ALJ did not err in assessing Lord's RFC, for the reasons described above, her final claim necessarily fails. See Chambers, 2016 WL 6238514, at *9 (citing Reynolds v. Colvin, No. 14-cv-439-LM, 2015 WL 2452718, at *8 (D.N.H. May 22, 2015)).

## IV. Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Lord's claim, see Manso-Pizarro, 76 F.3d at 16, her motion for an order reversing the Acting Commissioner's decision, document no. 8, should be denied, and the Acting Commissioner's motion for an order affirming her decision, document no. 11, should be granted.

Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice. <u>See</u> Fed. R. Civ. P. 72(b)(2). The 14-day period may be extended upon motion. Failure to file a specific written objection to the Report and Recommendation within the specified time waives the right to appeal the district court's order. <u>See</u> <u>Santos-Santos v. Torres-Centeno</u>, 842 F.3d 163, 168 (1st Cir. 2016).

Andrea K. Johnstone
United States Magistrate Judge

July 23, 2019

cc: All counsel